J-S29003-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: V.V. A/K/A V.E.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: V.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3440 EDA 2017 |

Appeal from the Decree Entered September 14, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): 51-FN-001861-2015
CP-51-AP-0000528-2017
CP-51-DP-1000107-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: J.V. A/K/A J.E.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: V.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3441 EDA 2017 |

Appeal from the Decree Entered September 14, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): 51-FN-001861-2015
CP-51-AP-0000527-2017
CP-51-DP-1000108-2016

BEFORE:   PANELLA, J., MURRAY, J., and STEVENS*, P.J.E.

MEMORANDUM BY PANELLA, J.                    **FILED JULY 19, 2018**

Appellant, V.C. ("Mother"), appeals from the decrees and orders entered September 14, 2017, involuntarily terminating her parental rights to V.E.V. (born in March 2012), and J.E.V. (born in January 2013) (collectively,

_____
* Former Justice specially assigned to the Superior Court.

"the Children") pursuant to 23 Pa.C.S.A. § 2511 (a)(1), (2), (5), (8), and (b) of the Adoption Act, and pursuant to 42 Pa.C.S. § 6351 of the Juvenile Act changing the Children's permanency goal to adoption.[1] We affirm

The trial court has set forth the relevant history of this case in its opinion. **See** Trial Court Opinion, 12/14/17, at 2-9. We adopt the court's recitation for purposes of this appeal, and we set forth herein only those facts, as found by the court, that are necessary to understand our disposition of the appeal.

The Philadelphia Department of Human Services ("DHS") has been involved with this family since October 2015 when Mother's oldest child, D.G., was adjudicated dependent and committed to the legal custody of DHS while the Children remained in Mother's care. On March 24, 2016, DHS and the Community Umbrella Agency ("CUA") held a single case plan ("SCP") meeting. Mother's SCP objectives were: (1) to address loss, grief and anxiety issues through individual therapy; (2) to complete an assessment through Behavioral Health Services; (3) to attend weekly-supervised visits at the agency; (4) to secure stable housing; and (5) to comply with the requirements of Achieving Reunification Center ("ARC").[2]

---

[1] The Children's biological father, A.V., ("Father") is deceased.

[2] On July 27, 2016, Mother voluntarily terminated her parental rights to D.G.

On May 18, 2016, DHS received a General Protective Services ("GPS") report that Mother and the Children were homeless and moving from home to home. The report also stated that Mother was unemployed, abusing illegal and prescription drugs, and unable to provide for the Children. The report further alleged that Mother refused to provide information as to where the Children were currently residing. On the same day, DHS received a second GPS report, stating that the Children were residing with a family friend, A.M., and an Order of Protective Custody ("OPC") was needed for the Children because Mother was transient and was not in compliance with her mental health treatment.

On May 19, 2016, the report was substantiated when DHS went to the home of A.M. Mother admitted that she did not have a home, and that putting the Children in placement was the best option at this time. On the same day, DHS obtained an OPC for the Children and placed them in foster care through Second Chance.

At the shelter care hearing on May 20, 2016, the court lifted the OPC and ordered the Children to remain in the custody of DHS. On June 6, 2016, the court adjudicated the Children dependent, granted DHS legal custody of them, and ordered continued foster care placement through Second Chance. The court further ordered Mother to attend supervised weekly visits at the agency and to complete an assessment, screening and three random drug tests at Clinical Evaluation Unit ("CEU").

On August 3, 2016, DHS and CUA held an SCP meeting. Mother's SCP objectives were: (1) to address loss, grief and anxiety through individual therapy; (2) to complete three random drug and alcohol screens; and (3) to have weekly supervised visits with the Children at the agency. Mother's SCP plan was revised on November 19, 2016, to include two additional SCP objectives, which were: (1) to find stable housing; and (2) to comply with ARC services.

Several permanency hearings were held between 2016 through 2017. On May 19, 2017, DHS filed petitions to involuntarily terminate Mother's parental rights to the Children, and change the Children's permanency goal to adoption. The court held a hearing on the petitions on September 14, 2017. At the hearing, the Children were represented by both a guardian *ad litem* and a special child advocate. DHS presented the testimony of Ms. Dollie Smallwood, CUA case manager. Mother, represented by counsel, testified on her own behalf. On the same day, the court entered its decrees and orders involuntarily terminating Mother's parental rights to the Children, and changing the Children's permanency goal to adoption.

Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Mother raises the following issues for our review:

> 1. Whether the trial court's ruling to involuntarily terminate Mother's parental rights to the Children was supported by clear and convincing evidence establishing grounds for involuntary termination?

2. Whether the trial court's decision to change the Children's permanency goals from reunification with Mother to adoption was supported by clear and convincing evidence that such decision would best serve the Children's needs and welfare?

Mother's Brief, at 5.[3]

In matters involving involuntary termination of parental rights, our standard of review is as follows:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

[T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-

_____

[3] While Mother's second issue appears to raise both a § 2511(b) claim and a challenge to the court's order changing the Children's permanency goal to adoption, Mother only preserved her subsection (b) claim. Any opposition to the court's order changing the Children's permanency goal to adoption is deemed waived as Mother failed to present argument as to this issue in her brief. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."). *See also In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017).

specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012) (internal citations omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act. The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted).

We may affirm the court's decision regarding the termination of parental rights with regard to any *one* subsection of § 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, the court terminated Mother's parental rights pursuant to § 2511(a)(1), (2), (5), (8) and (b). We will discuss only § 2511(a)(2) and (b).

Subsection (a)(2) provides as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

23 Pa.C.S.A. § 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002)).

A parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See In re A.L.D.*, 797

A.2d at 337. And a parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. **See id**., at 340.

With respect to subsection (a)(2), the court relied on the credible testimony of Ms. Smallwood, finding clear and convincing evidence that Mother failed to address the conditions which brought the Children into placement. **See** Trial Court Opinion, 12/14/17, 16-17. The court noted that Mother does not have adequate housing, employment, or parenting skills, and has not complied with her mental health treatment. **See id**., at 19. The court opined that Mother's lack of action demonstrates her inability to care for the Children now or in the future, as her overall situation is no better today than when the Children came into care. **See id**. The court, therefore, concluded that the evidence sufficiently establishes that Mother lacks the capacity to adequately provide parental care and control, and a stable environment for the Children, and her incapacity will not be remedied in the future. **See id**.

Mother, however, contends that the court's decision to involuntarily terminate her parental rights to the Children under this subsection was not supported by clear and convincing evidence. Mother argues that the evidence presented at trial did not establish any SCP objective that Mother substantially failed to meet which would prohibit her from reunification with the Children. Mother claims that she attended visitation with the Children,

went to court-ordered drug screens, received mental health treatment and secured proper housing. Because she substantially complied with most of her SCP objectives, maintained regular and loving contact with the Children, and has a nurturing parental relationship with the Children, Mother submits that DHS failed to present "clear and convincing" evidence of her repeated and continued incapacity, abuse, neglect, refusal or her unwillingness to timely rectify and correct the circumstances that led to the Children coming into foster care. We disagree.

After a thorough review of the record in this matter, we conclude that the court did not abuse its discretion by involuntarily terminating Mother's parental rights to the Children. During the termination hearing, Ms. Smallwood informed the court that she has been involved with the family since November 2015, when Mother's oldest child was under the care of DHS. *See* N.T., 9/14/17, at 7. Ms. Smallwood testified that the Children came into foster care on or about May 24, 2016, because Mother was transient, did not have stable housing, and was unable to meet the Children's basic needs by enrolling them in a childcare center or taking them to medical appointments. *See id*., at 8, 31-32. Ms. Smallwood stated that Mother's SCP goals were: (1) to stabilize her mental health; (2) to enhance the bond between her and the Children by attending weekly supervised visitation; (3) to obtain stable housing so that she could reunify with the Children; (4) to comply with ARC services; and (5) to comply with her court-

ordered CEU drug and alcohol screenings, assessments and tests. *See id*., at 8. Ms. Smallwood testified that she has spoken with Mother on several occasions about her SCP goals, and Mother has previously attended the SCP meetings via phone and in person. *See* **id**., at 9.

Ms. Smallwood stated that Mother was diagnosed with anxiety, and is still grieving over the loss of Father. *See id*., at 10. Ms. Smallwood testified that Mother was recommended to attend therapy so that she can address her grief over Father's death and her anxiety issues, which prevent her from leaving the house and being active. *See id*., at 19. Ms. Smallwood informed the court that Mother was minimally compliant with her mental health treatment. *See id*., at 9. Ms. Smallwood testified that although Mother would attend sessions for her medicine management, she was not consistent with her individual therapy at Comhar. *See id*., at 10. Ms. Smallwood opined that, since Mother has not met her mental health objective, she did not think it would be appropriate for Mother to reunify with the Children. *See id*., at 16.

Ms. Smallwood informed the court that Mother was referred to ARC five times for women's empowerment, financial employment and housing services. *See id*., at 11. She testified that Mother has not engaged in any of those services. *See id*. Ms. Smallwood stated that Mother is unemployed and receives benefits from the Department of Public Welfare ("DPW"). *See id*., at 30. Regarding housing, Ms. Smallwood testified that Mother failed to

obtain a secure, safe and appropriate housing for reunification. Ms. Smallwood informed the court that Mother is currently living at Maternal Grandmother's residence with Maternal Grandmother and Maternal Grandmother's boyfriend. *See id*. Ms. Smallwood stated that she was not made aware of Mother's change of residence until Tuesday, September 12, 2017, two days prior to the termination hearing. *See id*., at 12. Ms. Smallwood testified that she does not have any information or knowledge as to whether Maternal Grandmother's residence is an appropriate home for the Children to be reunified with Mother. *See id*.

Ms. Smallwood stated that Mother was court-ordered to CEU for drug assessment, testing, monitoring and three random drug screens. *See id*., at 12. Ms. Smallwood noted the CEU reports, stating Mother tested positive for benzodiazepines on June 6, 2016, and August 26, 2016, Mother tested positive for benzodiazepines and opiates on July 18, 2016, and Mother tested positive for benzodiazepines and cocaine on September 2, 2016. *See id*., at 13-14. (Benzodiazepines are used legally for the treatment of anxiety, but are commonly abused.) Ms. Smallwood testified that Mother has never presented any prescription for benzodiazepines to her or CEU. *See id*., at 13. Ms. Smallwood stated that Mother never informed her or presented any document that she enrolled or completed a drug and alcohol program since the positive drug screens in fall of 2016. *See id*., at 14. Ms. Smallwood further testified that Mother failed to report to CEU for any sort

of assessment and for the three random drug screens between every court hearing as ordered by the court. ***See id***.

Ms. Smallwood stated that Mother's weekly supervised visitations were modified to bi-weekly supervised visitations in December 2016, but it was changed back to weekly due to her failure to regularly attend the visitations. ***See id***., at 16. Ms. Smallwood stated that Mother has been inconsistent with her weekly supervised visitations with the Children. ***See id***. Ms. Smallwood stated that Mother has only been to seven or eight visits since January 2017. ***See id***., at 18. Ms. Smallwood also stated that she has personally observed some of Mother's visitations with the Children. ***See id***., at 19. Ms. Smallwood testified that there were some incidents where Mother was excused from visitation due to her behavior and language, but for the most part, her interaction with the Children was appropriate. ***See id***.

Mother testified that she is currently living with Maternal Grandmother and Maternal Grandmother's boyfriend in a three-bedroom house. ***See id***., at 41. Mother stated that she receives supplemental security income ("SSI") for her anxiety disability and gets food stamps from DPW. ***See id***., at 45. Regarding ARC services for housing and employment, Mother stated that she scheduled two appointments with ARC, but was not able to attend either appointment. ***See id***., at 48.

Mother informed the court that she has had anxiety since she was fifteen years old. ***See id***., at 41. Mother testified that she is prescribed a

benzodiazepine medication called clozapine for anxiety. *See id*., at 42. Mother stated that she was recently diagnosed with having colitis, a physical condition that affects her stomach, intestines and bowels, making it hard to move or walk because it is so painful. *See id*., at 49. Mother testified that she is prescribed several pain medications such as naproxen, androstendedione, and oxycodone for colitis. *See id*., at 43, 51. Mother stated that she missed a random drug screening and her re-assessment at CEU because she was suffering from colitis. *See id*., at 49. Mother also testified that she has not used cocaine since September 2016. *See id*., at 48.

Mother testified that it was recommended for her to attend therapy every two weeks. *See id*. Mother admitted that she has not been attending therapy lately and does not remember her last therapy session. *See id*., at 44. Mother stated that she consistently meets with her psychiatrist for her medication management every three months. *See id*., Mother testified that she does not believe her mental condition impairs her ability to parent the Children or secure housing for her family. *See id*., at 45.

Mother stated that this year, she visited the Children about once a month as opposed to twice a month. *See id*., at 46. Mother claimed that she was getting confused about the dates for visitation. *See id*. Mother admitted that there was tension at one of the visits because she was upset that the Children referred to Foster Mother as "Mother." *Id*., at 47. Mother testified

that she told the Children that she is "Mommy," and Foster Mother is not "Mommy." *Id*.

At the conclusion of the termination hearing, the court noted that Mother's testimony conflicted with Ms. Smallwood's testimony. *See id*., at 53. The court found Mother's testimony inconsistent, unsupported, and self-serving. *See id*. The court noted that the Children were removed from Mother's care for more than just housing reasons, as Mother was transient and unable to provide basic care and safety for the Children. *See id*., at 54. The court opined that Mother's transient condition that existed at the beginning of the case was not relieved when she informed Ms. Smallwood that she now has potentially suitable housing just prior to the trial. *See id*., at 55. The court determined that, despite the intensive efforts made by DHS and CUA to help Mother reunify with the Children, Mother did not complete her SCP objectives. *See id*., at 54. The court found that Mother's failure to complete her five SCP objectives demonstrates her disinterest in reunifying with the Children. *See id*., at 54. Thus, the court concluded that DHS met its burden by clear and convincing evidence that the involuntary termination of Mother's parental rights was warranted under subsection (a)(2). *See id*., at 55.

We conclude that Mother's arguments regarding subsection (a)(2) essentially seek for this Court to make credibility and weight determinations different from those of the trial court. The record clearly reveals that Mother

did not make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. The record demonstrates that the Children have been in foster placement since approximately May 2016, at which time V.E.V. was four years old and J.E.V. was three years old. By the time of the termination hearing, the Children had been in foster placement approximately one year and four months, and are now five and four years old. The testimony presented at the termination hearing establishes that Mother was aware of her SCP goals, but failed to comply despite ample amount of time given to do so. Accordingly, Mother did not engage in reasonable efforts to reunify with the Children.

As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused the Children to be without essential parental control or subsistence necessary for their physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. *See id*. Thus, the court did not abuse its discretion in terminating Mother's parental rights under subsection (a)(2).

To the extent that Mother argues that DHS did not engage in reasonable efforts to help her reunify with the Children, this argument is without merit. When reviewing a termination decree on appeal, we do not consider whether DHS made reasonable efforts. Our Supreme Court has rejected the argument that the provision of reasonable efforts by the county children's services agency is a factor in termination of the parental rights of a parent to a child. *See In re D.C.D.*, 105 A.3d 662, 673-674, 676 (Pa. 2014).

We next determine whether termination was proper under § 2511(b). Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability. … [T]he determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (some citations, brackets and quotation marks omitted; brackets added).

"[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citations omitted). When evaluating a parental bond, "the

court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).

Here, the court concluded that DHS presented clear and convincing evidence that termination of Mother's parental rights met the developmental, physical and emotional needs and welfare of the Children. *See* Trial Court Opinion, 12/14/17, at 20. The court determined that the testimony of Ms. Smallwood was sufficient to provide the court with adequate evidence to evaluate the parent-child relationship between Mother and the Children. *See id*. The court found that the Children do not have a parent-child bond with Mother, and they do not ask for Mother because they are well-bonded in their foster home. *See id*. The court concluded that the Children would not suffer irreparable harm if Mother's parental rights were terminated, and it would be in the Children's best interest to be adopted by Foster Mother. *See id*.

Mother, however, contends that the court did not give primary consideration to the developmental, physical and emotional needs and welfare of the Children, as required under subsection (b), to support an involuntary termination of her parental rights. Mother claims that Ms. Smallwood, a non-expert witness, was incorrectly allowed to offer opinion testimony under Pennsylvania Rules of Evidence 701 and 702 as to the

relationship and bond between Mother and the Children, and that they would not suffer any adverse effects if Mother's parental rights were terminated. Mother submits her testimony that she is bonded with the Children and that they would experience trauma and emotional harm if her parental rights were terminated, emphatically refuted Ms. Smallwood's lay opinion. Mother, thus, maintains that the court erred in finding DHS presented clear and convincing evidence that termination of her parental rights serves the Children's best interests and their developmental, physical and emotional needs and welfare.

Ms. Smallwood testified that the Children currently live in a foster home through Jewish Family Children Services. *See* N.T., 9/14/17, at 20. Ms. Smallwood testified that the Children have lived at their current foster placement since January 2017. *See id*. Ms. Smallwood stated that she has observed the Children with Foster Mother. *See id*. Ms. Smallwood informed the court that the Children are bonded to Foster Mother. *See id*. Ms. Smallwood testified that they call Foster Mother "Mom," and call the other children in their foster home their siblings. *See id*.

Ms. Smallwood testified that Mother does not contact her to ask about the Children except when she wants visitation. *See id*., at 20-21. Ms. Smallwood stated that Mother is not involved in any of their medical appointments or their daily development. *See id*., at 21. Ms. Smallwood opined that the Children would not suffer any irreparable harm if Mother's

parental rights were terminated. *See id*., at 21. Ms. Smallwood also opined that she believes it would be in the Children's best interests for them to be adopted by Foster Mother. *See id*., at 22.

Mother testified that she has a parental bond with the Children. *See id*., at 47. Mother testified that the Children refer to her as "Mom." *Id*. Mother admitted that there was tension at the visitation because she was agitated that the Children also refer to Foster Mother as "Mom." *Id*. Mother stated that she believes the Children love her very much, and that they would be emotionally harmed if they did not see her again. *See id*.

Based on the foregoing testimonial evidence and the totality of the record evidence, we discern no abuse of discretion or legal error by the court in concluding that termination of Mother's parental rights would best serve the Children's needs and welfare. The court thoroughly considered the Children's bond with Mother, and the effect of severing that bond. Because the trial court is not required to use expert testimony when conducting a bonding analysis, the court properly relied on Ms. Smallwood's testimony, and determined that there is no bond or substantial relationship between the Children and Mother that, if severed, would cause a detrimental effect on the Children. The evidence also establishes that the Children receive consistency and permanency by having their emotional and developmental needs met by Foster Mother. As such, the court correctly prioritized the Children's

emotional well-being and need for safety, permanency and stability over Mother's wishes.

While Mother may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *See In re Z.P.*, 994 A.2d at 1121. A child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*., at 1125. Rather, "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

"[W]e will not toll the well-being and permanency of [a child] indefinitely." *In re C.L.G.*, 956 A.2d 999, 1007 (Pa. Super. 2008) (citation omitted). Thus, the failure to terminate Mother's parental rights would condemn the Children to a life in foster care with no possibility of obtaining a permanent and stable home.

As there is competent evidence in the record that supports the court's findings and credibility determinations, we find no abuse of the court's discretion in terminating Mother's parental rights to the Children under subsection (b).

Accordingly, because we conclude that the court did not abuse its discretion by involuntarily terminating Mother's parental rights pursuant to § 2511(a)(2) and (b), we affirm the decrees and orders of the trial court.

Decrees and Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/19/18